567 P.2d 1257

DAWSON ENTERPRISES, INC., an Illinois Corporation, Plaintiff-Appellant,

v.

BLAINE COUNTY, a subdivision of the State of Idaho, and Ray Sweat, C. W. Gardner, and Jack R. Bennett, Board of County Commissioners, Defendants-Respondents.

No. 12061.

Supreme Court of Idaho.

Aug. 12, 1977.

on the west as it intersects the Union Pacific railroad right-of-way on the east.

Because the land was zoned R–2 (one acre residential/agricultural), Dawson applied to the Blaine County Planning and Zoning Commission for a reclassification. A hearing was held on October 2, 1973, but, with Dawson's approval, the application was tabled until February 1, 1974, pending the outcome of a special study of the entire corridor north of Hailey. With matters in this posture, Dawson exercised his option and bought the 12.8 acres at a total cost of $128,000 from Gary Hibbard who, in 1961, had paid $87 per acre for the property.

At a meeting of the Planning and Zoning Commission on April 9, 1974, Dawson's rezoning application was denied. Appeals were taken to the Blaine County Board of Zoning Appeals (denial sustained, May 22, 1974) and to the Blaine County Board of County Commissioners (denial sustained, June 24, 1974). Dawson then brought suit in District Court. A trial was held on May 6 and 7, 1975. The denial was again sustained in a judgment entered by the district court on August 2, 1975. Appeal is taken from that judgment.

Gerald W. Olson of Johnson & Olson, Pocatello, for plaintiff-appellant.

Thomas B. Campion, Sp. Asst. Atty. Gen., Ketchum, for defendants-respondents.

BISTLINE, Justice.

Dawson Enterprises, Inc., an Illinois corporation authorized to do business in Idaho, hereinafter referred to as Dawson, is the stockholder of Dawson Ramsey Motor Sales, the General Motors franchise holder located on Main Street in Ketchum. Deeming the existing location outmoded, Dawson acquired an option to purchase the subject property, a 12.8 acre site located about 2½ miles north of the city limits of Hailey and eight miles south of Ketchum. The property is wedge-shaped, with the apex of the triangle being formed by U.S. Highway 93

## I.

Dawson's first assignment of error concerns the trial court's failure to rule the Blaine County zoning ordinance in question as void. This, in turn, rests on the court's failure to find that a separately enacted comprehensive plan was "a statutory condition precedent necessary to support land use regulations adopted by the government entity" and that "without such a comprehensive plan the zoning must.fall." Appellant argues that at no time relevant for this case "had Blaine County implemented such a comprehensive plan but only private objectives of those members of the Planning and Zoning Commission and the Planning Administrator."

We are thus presented with our first opportunity to construe the familiar statutory language requiring that all zoning "regula-

tions shall be made in accordance with a comprehensive plan." I.C. § 50–1203.[1]

The language, as the compiler's note makes clear, parallels that found in the statutes of many other jurisdictions which have adopted the Standard State Zoning Enabling Act published by the United States Department of Commerce in 1925.

In construing such language the courts have been unanimous in stressing the importance of careful, open and comprehensive planning as a precondition for zoning. Zoning regulations are not ends in themselves; *they are but the means to the end of sound planning for the public good.*

"Underlying the entire concept of zoning is the assumption that zoning can be a vital tool for maintaining a civilized form of existence only if we employ the insights and the learning of the philosopher, the city planner, the economist, the sociologist, the public health expert and all the other professions concerned with urban problems.

"This fundamental conception of zoning has been present from its inception. The almost universal statutory requirement that zoning conform to a 'well-considered plan' or 'comprehensive plan' is a reflection of that view. [Citations omitted.] The thought behind the requirement is that consideration must be given to the need of the community as a whole. In exercising their zoning powers, the local authorities must act for the benefit of the community as a whole following a calm and deliberate consideration of the alternatives, and not because of the whims of either an articulate minority or even majority of the community [citation omitted]. Thus the mandate [of the relevant statute] is not a mere technicality which serves only as an obstacle course for public officials to overcome in carrying out their duties. Rather, the comprehensive plan is the essence of zoning. Without it, there can be no rational allocation of land use." *Udell v. Haas*, 21 N.Y.2d 463, 288 N.Y.S.2d 888, 893–94, 235 N.E.2d 897, 900–901 (1968).

The opinion in that case went on to note the danger that without a comprehensive plan, "zoning, considered as a self-contained activity rather than as a mean to a broader end, may tyrannize individual property owners." Moreover, the absence of such a plan would make it impossible for a reviewing court to evaluate the regulation as actually being directed to the health, safety, welfare and morals of the community.

The question, then, is not the desirability and necessity for comprehensive planning. The question is: What document may be found to embody the plan? Professor Anderson remarks that the notes accompanying the 1926 version of the Standard State Zoning Enabling Act clearly indicate that

" . . . the draftsmen intended to require some planning as an integral part of the zoning process. It is equally clear that no provision for the preparation or adoption of a written plan beyond the text of the zoning ordinance was spelled out in the act or referred to in the notes. It remained for the courts to give dimension to the requirement that zoning regulations be made in accordance with a comprehensive plan." 1 Anderson, American Law of Zoning § 5.03, p. 265 (2nd Ed. 1976).

In turning for guidance to the courts, Rathkopf, in his 1959 edition of The Law of

1. The statute then in effect stated:
"50–1203. Regulations—Purposes in view.—Such regulations shall be made in accordance with a comprehensive plan, and shall be designed to lessen congestion in the streets, to safeguard from fire, panic and other damages, to promote public health, safety, morals and the general welfare, to provide adequate light and air, to prevent the overcrowding of land, to avoid undue concentration of population, to facilitate the adequate provision of transportation, water, sewerage, schools, parks and other public requirements. Such regulations shall be made with reasonable consideration, among other things, as to the character of the district and its peculiar suitability for particular uses, and with a view to conserving the value of buildings and encouraging the most appropriate use of land throughout such city." 1967 Idaho Sess. Law, ch. 429, § 211, p. 1249.

Zoning and Planning, Chapter 9, § 1, maintains that "the best analysis of a comprehensive plan" ever provided as a gloss on the Enabling Act's language was that found in a then recent decision of the New Jersey Supreme Court. There, after noting that the evil to be avoided is "capricious exercise of the legislative power resulting in haphazard or piecemeal zoning," the court went on to remark:

> "Without venturing an exact definition, it may be said for present purposes that 'plan' connotes an integrated product of a rational process and 'comprehensive' requires something beyond a piecemeal approach, both to be revealed by the ordinance considered in relation to the physical facts and the purposes authorized [by the New Jersey statute]. Such being the requirements of a comprehensive plan, no reason is perceived why we should infer the Legislature intended by necessary implication that the comprehensive plan be portrayed in some physical form outside the ordinance itself. A plan may readily be revealed in an end-product—here the zoning ordinance—and no more is required by the statute." *Kozesnik v. Montgomery Township*, 24 N.J. 154, 131 A.2d 1, 7–8 (1957).

Dawson cites us to no case in which the applicable statutory language has ever been held to require the enactment of a separate comprehensive plan as a condition precedent to the validity of a zoning ordinance. Rather the general rule has become firmly established that, absent specific requirements in the enabling legislation, "the comprehensive plan need not have a separate physical existence apart from the zoning ordinances, and it need not be in writing, but its design may be found in the scheme apparent in the zoning regulations themselves." 8 McQuillin, Municipal Corporations, § 25.78, p. 201 (3d ed. 1976). And *see*, 1 Anderson, American Law of Zoning, § 503, p. 268 (2d ed. 1976); 1 Yokley, Zoning Law and Practice, § 3.3 (1976 Cum.Supp.); Haar, "In Accordance with a Comprehensive Plan," 68 Harvard L.Rev. 1154 (1955); *Weigel v. Planning and Zoning Com'n of Town of Westport*, 160 Conn. 239, 278 A.2d 766 (1971); *Nottingham Village, Inc. v. Baltimore County*, 266 Md. 339, 292 A.2d 680 (1972); *Lanphear v. Township of Antwerp, Cty. of Van Buren*, 50 Mich.App. 641, 214 N.W.2d 66 (1973); *Tulsa Rock Co. v. Board of Cty. Com'rs of Rogers Cty.*, 531 P.2d 351 (Okl.Ct.App.1975); *Cleaver v. Board of Adjustment*, 200 A.2d 408 (1964); *Shelton v. City of Bellevue*, 73 Wash.2d 28, 414 Pa. 367, 435 P.2d 949 (1968).

In the present case, Judge Kramer found that the Blaine County zoning ordinances

> ". . . themselves defining the classifications of lands extensively define what will be permitted within each zone that is adopted. What we have then, it appears to the Court, is in essence an adoption of a general comprehensive plan, when the zones as recommended by the Planning & Zoning Commission are, in effect, adopted by the Board of County Commissioners. . . .
>
> "Certainly by the adoption of the zoning ordinances and the use of defendants' exhibit 4 [Blaine County Planning and Zoning Objectives], a comprehensive plan was adopted sufficiently to comply with Idaho Code 31–3804 and Idaho Code 50–1104."[2]

2. Justice Bakes rejects this finding of the district court on the grounds that the Blaine County zoning ordinance does not "show how it furthers the purposes listed in I.C. § 50–1203" and because "no comprehensive plan is apparent from its zoning scheme." We decline the invitation to spell out in detail the ways in which the specific planning and zoning objectives quoted at length in Justice Bakes' footnotes are compatible with the broad goals of § 50–1203, or how they are translated into the actual map of concentric and progressively more restrictive zones radiating out from each of the county's urban centers.

The district court had before it the account by the county commissioners of the extensive work which went into Blaine County's 1970 zoning revision, as well as the county planner's narration of the considerations—safety, hydrology, soil composition, wildlife preservation, traffic control and availability of governmental services—which went into the new ordinance. We accept the finding of the district court that the Blaine County zoning ordinance is "in ac-

The trial court's conclusion that the adoption of a separate comprehensive plan was not a "condition precedent" to the validity of the zoning ordinances was correct.

■ One word of caution. The opposite result would be compelled in the presence of an enabling statute which expressly makes the adoption of a comprehensive plan a condition precedent to the validity of a zoning ordinance. Such a procedure is mandated by the 1975 Local Planning Act, I.C. §§ 67–6507 through –6511.[3] *And see, Baker v. City of Milwaukie,* 170 Or.App. 89, 520 P.2d 479 (1974), aff'd, 271 Or. 500, 533 P.2d 772 (1975).

## II.

Dawson next challenges the reasonableness of the zoning ordinance. The challenge here is twofold. First, the ordinance is said to be void initially because it arbitrarily, capriciously and unreasonably restricts development along this heavily traveled corridor to agricultural and residential uses when the most appropriate use of the land would be for commercial services. Second, Dawson contends that the order is arbitrary, capricious and unreasonable as applied to this property in particular. The trial judge held that Dawson had not carried its burden of persuading the court that the ordinance was unreasonable on its face; and that to grant Dawson's request for a rezone of this particular property would be invalid as an instance of spot zoning.

■ This Court has frequently stated, and it is now beyond dispute, that a local legislative body has the right to enact zoning ordinances. *Cole-Collister Fire Protec-*

tion Dist. v. City of Boise, 93 Idaho 558, 468 P.2d 290 (1970). However, since the power to zone derives from the police power of the state, Idaho Constitution, art. 12, § 2, the zoning ordinance must bear a reasonable relation to goals the state may properly pursue under its police power. This limitation was made clear in *Cole-Collister* where the Court quoted the following language approvingly:

"The governmental power to interfere by zoning regulations with the general rights of the land owner by restricting the character of his use, is not unlimited, and other questions aside, such restriction cannot be imposed if it does not bear a substantial relation to the public health, safety, morals, or general welfare." *Nectow v. City of Cambridge,* 277 U.S. 183, 188, 48 S.Ct. 447, 448, 72 L.Ed. 842 (1927).

In making the determination, however, we note that our review of decisions of zoning authorities is limited. Zoning is essentially a political, rather than a judicial matter, over which the legislative authorities have, generally speaking, complete discretion. 8 McQuillin, Municipal Corporations, § 25.54, pp. 134–135 (3d ed. 1965); *Harrell v. City of Lewiston,* 95 Idaho 243, 247, 506 P.2d 470 (1973); *Idaho Falls v. Grimmett,* 63 Idaho 90, 117 P.2d 461 (1941). Since the local governmental bodies are most familiar with the problems of their particular jurisdictions, their legislative determinations come before us with a strong presumption of validity. Such presumption can only be overcome by a clear showing that the ordinance as applied is confiscatory, arbitrary, unreasonable and capricious. *Ready-to-Pour, Inc. v. McCoy,* 95 Idaho 510, 511 P.2d 792 (1973). If the validity of the legislative

---

cordance with a comprehensive plan." To hold otherwise would be to encourage every Idaho property holder who has ever received an adverse zoning determination to relitigate the matter under the 1975 Act.

3. *Justice Bakes twice refers us to the Local Planning Act of 1975 "for a clearer understanding of what the legislature had in mind in requiring a comprehensive plan."* The 1975 Act, however, was universally recognized as a significant departure from prior land use planning in Idaho and thus is not an appropriate

gloss upon the language of former I.C. § 50–1203.

Similarly, the Ramapo ordinance (with its decades-long phasing in of services and its system of point accumulation as a precondition to development) and the Petaluma ordinance (with its outright partial moratorium on development) stand as possible planning devices of the 1970's, not as the minimum legal requirements envisioned by the 1925 legislature in demanding that zoning ordinances be adopted "in accordance with a comprehensive plan."

classification for zoning purposes be fairly debatable, the legislative judgment must be allowed to control and the court may not substitute its judgment for that of the zoning authority. It is not the function of this Court or of the trial courts to sit as super zoning commissions. The burden of proving that the ordinance is invalid rests upon the litigant who attacks the validity of the ordinance. The burden is all the heavier when, as here, the validity of the ordinance in question has been upheld by three strata of local governmental appeals as well as by the affirmance of the district court. *Cooper v. Board of Ada Co. Com'rs*, 96 Idaho 656, 534 P.2d 1096 (1975).[4]

#### A.

In addressing the reasonableness of the ordinance, Dawson first maintains that the trial court erred in focusing "exclusively on the question of rezoning rather than the void initial zoning." The initial voidness, it is argued, consists in designating the heavily traveled corridor along U.S. 93 as residential rather than as commercial. Dawson urges upon us that such a designation is arbitrary, capricious and unreasonable because the property is most suitable for commercial and light industrial uses; it is already replete with such uses; no other adequate commercial zones exist under the present ordinance; and the land in question is not suitable for residential use.

The trial court found, as a matter of fact, that the area in question has some commercial uses which preexisted the 1971 zoning ordinance, but that it is not given over to extensive non-conforming use, and that there are a great number of residences in the area.

Thus, the heart of Dawson's argument boils down to the assertion that since "the highest and best use" for this district is a commercial property, it is arbitrary, capricious and unreasonable to restrict it to residential and agricultural use.

The argument is a familiar one, but we are cited to no authority where it has ever prevailed. In the landmark case of *Village of Euclid, Ohio v. Ambler Realty Co.*, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926), much the same argument was made. There, as here, the land in question was largely "farm lands or unimproved acreage." Dawson sought commercial zoning in the face of an ordinance restricting his property to residential use. There, too, the owner argued that his land was sandwiched between major thoroughfares and thus was unsuited for residential development. There it was alleged that the subject property was "immediately in the path of progressive industrial development"; here Dawson's expert reported that, absent the zoning restrictions, "the trend of the commercial strip north of Hailey will continue to develop for commercial uses, especially along the east side," and that such development would constitute "the highest and best use" of this land. In the *Euclid* case, it was argued that the restrictive zoning ordinance would transform $10,000 per acre land into land worth only $2,500 per acre;

---

4. "Essentially herein we are asked to review and reverse legislative judgments. Those judgments should not be overturned by this Court unless it can be shown that the ordinance bears no rational relationship to a permissible state objective." 96 Idaho at 659, 534 P.2d at 1099.

Justice Bakes objects to this standard of administrative review. It is, however, the universal norm. When the decision by the planning and zoning commission is reviewed by the board of zoning appeals, the determination made by the latter is presumed valid. The same presumption is accorded the subsequent decision of the county commissioners upon their review of the determination of the appeals board. Finally, decisions of the trial court always come before this Court with a presumption of validity. There is a universal "disavowal of any authority to substitute judicial discretion for administrative discretion" in virtually all zoning decisions. Anderson, 4 American Law of Zoning § 25.26.

Deference is accorded not because the stratum of "local government which had itself promulgated the ordinance later upholds" it. As Justice Bakes notes, this would be circular. Rather, deference is accorded because of the nature of the decision, the expertise of the administrative body, the different make-up of the reviewing agencies, their responsiveness to the local electorate, and the additional protection of district court review.

here, Dawson paid $10,000 per acre in hopes of commercial zoning for land which, as residential, is worth between $2,500 and $5,000 per acre.[5]

If anything, the landowner in *Euclid* had an even stronger case.[6] There, one owner had owned the land for many years in anticipation of escalating value as nearby industrial development moved closer; the ordinance in question was newly enacted and cut off these reasonable expectations; the hardship was aggravated by the fact that the land in question was split into two different zoning classifications; and the lower court had agreed with the landowner that the zoning ordinance was unconstitutional as a violation of the Fourteenth Amendment in that it "deprives appellee of liberty and property without due process of law and denies it the equal protection of the law."

Mr. Justice Sutherland, himself a long-time champion of these same constitutional rights was faced, in *Euclid,* with a question of first impression, a question involving ". . . the validity of what is really the crux of the more recent zoning legislation, namely, the creation and maintenance of residential districts, from which businesses and trade of every sort, including hotels and apartment houses, are excluded." 272 U.S. at 390, 47 S.Ct. at 119.

His answer was that

". . . the exclusion of buildings devoted to business, trade, etc., from residential districts, bears a rational relation to the health and safety of the community." *Ibid.*

Consequently, he was compelled to reverse the decision of the lower court and to uphold the right of the Village of Euclid to enact a zoning ordinance which restricted development to uses other than those which the market forces would have dictated as "highest and best."

In finding that the restrictive zoning ordinance in question bore a rational relation to valid goals of the police power delegated to the Village of Euclid by the state of Ohio, Mr. Justice Sutherland cited long lists of reasons suggested by the planning officials of his day. In the present case, the reasoning behind Blaine County's ban on commercial development in this corridor is grounded upon the policies announced in the Planning and Zoning Objectives which have guided the Planning and Zoning Commission since February, 1971:

"To promote low density development outside existing urban areas so as to maintain the open and rural character of the County and Wood River Valley,"

and,

"To promote the concentration of C–1 [Highway Commercial] development to areas in and adjacent to existing urban areas."

The property here in question is located along the last stretch of undeveloped highway south of the world famous ski resort of Sun Valley. The ordinance, in seeking to avoid strip-development along this stretch of highway and to maintain the open and rural character of the valley, is thus seeking to preserve the quality of what is perhaps the county's greatest resource. In promoting the concentration of commercial development within existing urban areas, the county is seeking to control population density, foster the free flow of

---

5. The former figure is the appraisal by appellant's expert witness; the latter, that of the expert witness for Blaine County.

6. At first glance, one might think that a long-term property owner whose planned development is cut short by a recently enacted zoning ordinance would have a stronger case than a speculator who buys in the face of a known zoning restriction. *Euclid* itself makes it clear that, in determining the validity of the ordinance and the merit of the variance request, such considerations are irrelevant. Justice Shepard's concurring opinion is therefore correct in holding that identity of owner, length of ownership and form of ownership are not factors to be weighed in the even-handed administration of zoning ordinances. The result in this case would be the same regardless of whether the variance were requested by a farmer or a speculator, by a long-term land owner or a recent purchaser, by a bona fide title holder or a straw man created by imaginative real estate draftsmen.

traffic and prevent congestion along a major artery, and avoid the costly consequences of spreading county services too thin. Such policies, it is clear, will oftentimes restrict the use of land to uses other than "the highest and best use" dictated by the marketplace and will prevent a landowner from using land for its most suitable use. But we cannot say that they bear no rational relation to the health, safety, morals and welfare of the community. Counsel for Dawson cites us to no cases which hold to the contrary. For cases upholding zoning ordinances though they restrict development to uses other than the highest and best or most suitable use, see, *Hukle v. City of Kansas City,* 212 Kan. 627, 512 P.2d 457, 465–466 (1973); *Thurman v. City of Mission, Johnson County,* 214 Kan. 454, 520 P.2d 1277, 1278 (1974) ("Even if it were to be conceded that the highest and best use for this property is for an office building, the fact remains that if zoning determinations were to depend on this factor alone, the very purpose of zoning would be nullified and spot zoning would be the order of the day."); *Nopro Co. v. Town of Cherry Hills Village,* 180 Colo. 217, 504 P.2d 344 (1973) ("[the] validity of zoning regulations has never been determined by the highest and best use concept or in terms of dollars and cents profitability."); *City of Tempe v. Rasor,* 24 Ariz.App. 118, 536 P.2d 239, 243 (1975) ("Suitability for a particular use does not mandate zoning to permit that use as a matter of law. To hold otherwise would be the very antithesis of sound zoning."); *Goldblatt v. Town of Hempstead,* 369 U.S. 590, 592, 82 S.Ct. 987, 989, 8 L.Ed.2d 130 (1962) ("If this ordinance is otherwise a valid exercise of the town's police powers, the fact that it deprives the property of its most beneficial use does not render it unconstitutional.").

## B.

█ Dawson's next challenge is to the reasonableness of the zoning classification as applied to its property in particular. The trial court posed the question as follows:

"From the observations made, it does appear that the use of this twelve-acre triangle for agricultural purposes is highly improbable. It also appears that the use of this property as residential property may be somewhat difficult. This, then, raises a primary question as to whether the Blaine County Planning & Zoning Commission acted arbitrarily in refusing to spot zone the twelve-acres when it is not readily suitable for agricultural use and questionable residential use."

We note at the outset that the term "spot zone" has two different meanings which must be kept separate if confusion is to be avoided. *See,* Anno.: Spot Zoning, 51 A.L. R.2d 251 (1957). In its broadest, merely "descriptive" sense, spot zoning is simply the reclassification of one or more tracts or lots for a use prohibited by the original zoning ordinance. As such, a request for a spot zone has no negative connotations. It simply demarcates the starting point for a court's inquiry. As guidelines for its inquiry,

". . . all the existing circumstances, or contemporaneous conditions, the objects sought to be obtained, and the necessity or lack thereof for its adoption will be considered by the court." *White v. City of Twin Falls,* 81 Idaho 176, 183, 338 P.2d 778, 783 (1959); *Continental Oil Co. v. City of Twin Falls,* 49 Idaho 89, 286 P. 353 (1930).

or, in the words of the Annotation,

"The most widely accepted tests of validity, sometimes stated or applied in combinations, sometimes separately, are whether or not the ordinance is in accordance with a comprehensive plan of zoning . . . and whether or not it is reasonably designed to promote the general welfare, or other objectives specified in the enabling statutes, rather than merely to benefit individual property owners or to relieve them from the harshness of the general regulation as applied to their property." 51 A.L.R.2d at 266.

█ Applying these tests, this Court has made it clear that reclassification of individual properties is valid when non-conforming uses are so pervasive that the char-

acter of the neighborhood has actually changed from its purported zoning classification; when there is selective or discriminatory application of the zoning ordinance to the particular property in question; when a property owner presents a *prima facie* case of unreasonableness and the zoning authority offers no evidence to show that its denial of the variance is reasonably related to valid zoning objectives; or when the use was incident to a valid non-conforming use which pre-existed the zoning ordinance in question. *See, Continental Oil Co. v. City of Twin Falls, supra; White v. City of Twin Falls, supra; Cole-Collister Fire Protection Dist. v. City of Boise, supra; Ready-to-Pour, Inc. v. McCoy,* 95 Idaho 510, 511 P.2d 792 (1973).

If, however, the court holds the zoning classification itself to be reasonably related to permissible goals of the state's police power, then the request for a variance to allow a non-conforming use is very likely to be "spot zoning" in its normative, "legal" sense. In this sense of the term, the grant of a variance

"which singles out a parcel of land within the limits of a use district and marks it off into a separate district for the benefit of the owner, thereby permitting a use of that parcel inconsistent with the use permitted in the rest of the district, is invalid if it is not in accordance with the comprehensive zoning plan and is merely for private gain." 51 A.L.R.2d 251; *Cassel v. Mayor and City Council of Baltimore,* 195 Md. 348, 73 A.2d 486 (1950).

Requests for spot-zoning are generally made to alleviate situations of "unnecessary hardship." In the present case, appellant Dawson testified that his grant of the General Motors franchise for this area was made contingent upon his relocation of the dealership. The corridor site was acquired by Dawson because G.M.'s market analysts selected it as centrally located between the markets of Sun Valley-Ketchum to the north and Hailey-Bellevue to the south. In response to this argument, Judge Kramer correctly held:

"Considerable testimony was introduced to the effect that General Motors demanded this location, and this Court is not impressed with such un argument. It is obvious that the Blaine County Planning & Zoning Commission, acting within its lawful authority, has the final say, together with the Blaine County Board of Commissioners, concerning zoning in Blaine County—and not General Motors."

Dawson's other plea of hardship concerns the fact that his parcel is unsuitable for residential development due to its odd triangular shape, its location between a railroad and a busy highway, and a sharp drop off in elevation which bisects the property. In weighing plaintiff's hardship in this case, we follow the well-established rule that

". . . a zoning plan must be viewed as a whole and the court will not search out individual cases of discrimination or hardship. Moreover, it is not necessary, in order to sustain such legislation, to show that the public welfare demands the exclusion of business uses for each individual lot in the area zoned." *Acker v. Baldwin,* 18 Cal.2d 341, 345, 115 P.2d 455, 457 (1941).

Any other rule would be incompatible with Euclidean zoning itself which, by its very nature, classifies on a district-by-district basis. If individual hardship exceptions were routinely granted, the result would be additional nonconforming uses which, in turn, would justify still further variances on the grounds of change-in-neighborhood or selective-and-discriminatory enforcement. Or, as the trial court put it in this case, "To allow this rezone application would create a 'commercial island' until the 'dominoes' did their thing." *And see, Esso Standard Oil Co. v. Town of Westfield,* 33 N.J.Super. 324, 110 A.2d 148 (1954); *Lewis v. City of Medina,* 87 Wash.2d 19, 548 P.2d 1093 (1976).

Here the trial court found an even-handed administration of the ordinance. All non-conforming uses pre-date the applicable ordinance; no variances have been granted since its passage. Furthermore, the public benefit is not here being invoked to gloss over all consideration of this particular par-

cel of land. On the contrary, the trial court stated:

"There was testimony to the effect that a curve exists in U.S. Highway 93 at this point which is commonly known in Blaine County as 'suicide corner.' The Court, accompanied by his reporter, drove to the northern end of the property in question and parked on the shoulder of the highway and witnessed the traffic coming up over the hill and around this corner. After observing the traffic and taking into consideration the testimony during trial, this Court believes that a commercial activity on this twelve-acre piece of land would be a definite traffic hazard. This would require controlling the traffic in some manner which, in turn, would probably result in undue traffic congestion."

Moreover, we cannot overlook the fact that Dawson's hardship in this case is self-inflicted since the option to purchase was exercised in full knowledge that the land was zoned residential and that a variance for commercial use had not been granted. As the Supreme Court of Colorado said, under similar circumstances:

"Nopro's land investment was made in full knowledge of the zoning limitations. It took the calculated risk that it could break the zoning use barrier and thereby double the profit from its investment. Having been denied the means by which this might be accomplished, it claims hardship. If hardship exists under the facts of this case—and we hold that it does not—it was incurred voluntarily by the choice of Nopro and was self-inflicted." *Nopro Co. v. Town of Cherry Hills Village*, 180 Colo. 217, 504 P.2d 344, 349 (1973).

In *Nopro*, as indicated, the developer was realizing a substantial profit on his investment and was complaining only that it could not make twice as much. *Manger v. City of Chicago*, 121 Ill.App.2d 358, 257 N.E.2d 473 (1970), was closer to the economic facts of this case in that plaintiff had actually put out cash for land that would be worth much less if the zoning variance was not granted. Nonetheless, the Illinois court reached the same conclusion:

"Plaintiffs purchased the two parcels comprising the subject property with full knowledge of its zoning restrictions. While a party who purchases property in the face of the existing zoning classification is not precluded from challenging the validity of the zoning classification, his purchase in the face of the existing zoning classification is one factor to be considered. [Citation omitted.] Plaintiffs admit that they purchased the two parcels comprising the subject property with the intention of endeavoring to secure a change of zoning classification and described their plans as a 'calculated risk' in paying $100,000.00 for what they knew to be the then true value of $15,000.00." 257 N.E.2d at 479.

Accordingly, the variance was denied.

■ Under the facts of this case, we cannot say that the trial court abused his discretion in upholding the determination of the Board of County Commissioners that this particular property might reasonably be zoned as it is.

As the Court said in *Johnston v. Boise City*, 87 Idaho 44, 390 P.2d 291 (1964),

"The exercise of authority under the police powers may, in certain instances, have a harmful effect upon an individual or property owner, but that alone is insufficient to justify an action for injunctive relief or for damages. If the enactment authorizing the exercise of the authority bears a reasonable relationship to the public health, safety, morals or general welfare, such enactment would be valid within the inherent powers of the legislative body. *White v. City of Twin Falls*, 81 Idaho 176, 338 P.2d 778, . . . If the exercise of the authority under such an enactment is reasonable and not arbitrary, any injury occasioned thereby must be considered a servitude inherent under our system of government, and damages from such injury must be considered as *damnum absque injuria.*" 87 Idaho at 52, 390 P.2d at 295.

For recent cases upholding the local zoning authority's denial of a variance despite a

demonstration of hardship, *see, Estes v. City of Moscow*, 96 Idaho 922, 539 P.2d 275 (1975); *Cooper v. Bd. of Ada Co. Com'rs*, 96 Idaho 656, 534 P.2d 1096 (1975); *County of Ada, Bd. of Co. Com'rs v. Walter*, 96 Idaho 630, 533 P.2d 1199 (1975).

### III.

■ Appellant's final claim is based on a theory of inverse condemnation. The theory has, in certain situations, long been recognized in this state:

"In *Renninger v. State,* 70 Idaho 170, 213 P.2d 911 (1950), this court recognized the validity of an inverse condemnation action by which a property owner institutes an action against the state to recover just compensation for an appropriation of land when the state has taken an interest in land and refused to institute eminent domain proceedings to determine the amount of just compensation." *State ex rel. Symms v. Nelson Sand and Gravel, Inc.,* 93 Idaho 574, 579, 468 P.2d 306, 311 (1970).

In short, inverse condemnation is invoked in situations where, as the United States Supreme Court stated in *Griggs v. County of Allegheny*, 369 U.S. 84, 82 S.Ct. 531, 7 L.Ed.2d 585 (1962), a governmental entity "in designing it [the project] had to acquire some private property," but where "by constitutional standards it did not acquire enough." 369 U.S. at 89, 90, 82 S.Ct. at 534.

This Court has entertained such claims when a government project interferes with private property rights by the flooding of neighboring land, *Renninger v. State*, 70 Idaho 170, 213 P.2d 911 (1950); *Zollinger v. Big Lost River Irrigation District*, 83 Idaho 411, 364 P.2d 176 (1961); or by impairing access to an owner's property through the destruction of his ingress-egress curb cuts, *Hughes v. State*, 80 Idaho 286, 328 P.2d 397 (1958); *Mabe v. State*, 83 Idaho 222, 360 P.2d 799 (1961); *Lobdell v. State*, 89 Idaho 559, 407 P.2d 135 (1965); *Snyder v. State*, 92 Idaho 175, 438 P.2d 920 (1968); or by converting the airspace over an owner's land to public use, *Roark v. City of Caldwell*, 87 Idaho 557, 394 P.2d 641 (1964).

Idaho's inverse condemnation cases form a pattern with common elements: (1) a governmental project of some sort (a new bridge, a reconstructed highway, a dam operation, an airport extension) is undertaken; (2) the construction or operation thereof damages or destroys the vested property rights of an adjoining land owner; (3) after which suit is brought to recover damages.

Appellant seeks to extend each of these three elements in new directions. (1) The "public use" here is not incident to a governmental enterprise, but rather is alleged to be the zoning ordinance's aesthetic objective of creating "open space." (2) The property right which is allegedly "taken" is appellant's interest in gaining the highest and best use of his land. (3) And appellant seeks not to trigger condemnation proceedings and an award of damages, but rather an injunction against county interference with the commercial use of his land.

■ There is no question that aesthetic considerations play a prominent role in Blaine County's policy of maintaining "the open and rural character of the County and Wood River Valley." Whether or not zoning restrictions may be held valid when based solely on aesthetic considerations is a hotly contested issue in the courts today. Many jurisdictions hold such restrictions invalid, especially if they are arbitrary in content, vaguely worded, discriminatorily enforced, or result in total deprivation of use. In other jurisdictions, the trend in recent years has been to uphold the validity of zoning restrictions based solely or predominantly on aesthetic considerations. *See,* Anno.: Zoning—Aesthetic Considerations, 21 A.L.R.3d 1222 (1968). The controversy, it should be noted, concerns zoning restrictions based *solely or predominantly* on aesthetic grounds. No such controversy exists when the aesthetic objectives form only part of the considerations which enter into the zoning restrictions:

"No such difference of opinion exists as to the validity of a zoning ordinance in a situation where aesthetic objectives are merely incidental to other considerations

providing the basis of the enactment. In such a situation it has been long recognized in many cases from various jurisdictions that a zoning ordinance may be valid even though it is based partly or incidentally on aesthetic considerations, as long as these considerations are not the sole purpose, or the overwhelming purpose, of the zoning regulations involved." 21 A.L.R.3d at 1225.

Courts are unanimous in holding, as the United States Supreme Court did in 1954, that,

"The concept of the public welfare is broad and inclusive. . . . The values it represents are spiritual as well as physical, aesthetic as well as monetary. It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled." *Berman v. Parker*, 348 U.S. 26, at 33, 75 S.Ct. 98, at 102, 99 L.Ed. 27 (1954).

Or, as the court stated two decades later:

" . . . The police power is not confined to elimination of filth, stench, and unhealthy places. It is ample to lay out zones where family values, youth values, and the blessings of quiet seclusion and clean air make the area a sanctuary for people." *Village of Belle Terre v. Boraas*, 416 U.S. 1, 9, 94 S.Ct. 1536, 1541, 39 L.Ed.2d 797 (1974).

In the present case Dawson argues that Blaine County's motive in restricting development north of Hailey to residential use is to create a "scenic corridor" and "open space." To characterize the ban on commercial use as an enforced dedication of private property for "open space" is, to say the least, misleading. The Supreme Court of Kansas was recently faced with much the same argument and responded as follows:

"[Plaintiffs] first contend that 'preserving the character of the neighborhood' is not a legitimate purpose of a zoning ordinance, because the result is 'aesthetic' and not related to the public welfare. The argument is difficult to follow. . .

The whole purpose of zoning is to restrict the permissible uses of land in a zone or 'neighborhood,' thereby preserving its 'character.'

"It does plaintiffs no good to characterize the purpose here as 'aesthetic.' As long ago as 1923 we recognized in a zoning case that '[t]here is an aesthetic and cultural side to municipal development which may be fostered within reasonable limitations. Such legislation is merely a liberalized application of the general welfare purposes of state and federal Constitutions.' [Citing a case from Kansas, and quoting in full the passages above from *Berman v. Parker and Village of Belle Terre v. Boraas*.]

. . . . .

"The zoning here, of course, is not 'aesthetic' in the sense that it purports to control the appearance of plaintiffs' property. The objective sought is the exclusion of commercial uses from a residential area. Any 'aesthetic' effect is purely incidental and entirely permissible. [Citing A.L.R. annotation, *supra*.] We hold that preserving the residential character of the neighborhood was a legitimate purpose of the zoning ordinance." *Houston v. Board of City Com'rs of City of Wichita*, 218 Kan. 323, 543 P.2d 1010, 1016 (1975).

We hold that Blaine County's zoning ordinance restricting the area north of Hailey to residential development, to the extent that it embodies the purpose of maintaining the rural character of the County and the Wood River Valley, is a valid exercise of the power of the state to regulate the use of land for the general welfare.

The second element of Dawson's inverse condemnation suit is the claim that his land has been confiscated because his land cannot be put to residential use at all. The testimony of expert witnesses at trial was to the contrary. Dawson paid $10,000 per acre for 12.8 acres, a total of $128,000. The expert witness for the county appraised the land at $120,000 if zoned commercial and at $60,000 if zoned residential. Dawson's own expert witness appraised the land

at $20,000 if zoned residential and $70,000 if zoned commercial (or only slightly more than half what Dawson paid to purchase the property). The trial court held that purchase of land for ten thousand dollars per acre when that land is only worth five thousand dollars per acre as zoned "does not make a condemnation case." Rather,

"the plaintiff company knew the area was zoned as residential to begin with. The plaintiff gambled and the gamble lost. This can hardly be determined to be confiscatory. Certainly, the plaintiff could have taken an option to purchase the property until the matter was resolved, or deposited the money in escrow until the matter was resolved or in some other manner protect itself."

Dawson's argument here is but an extension of the same argument made above in challenging the reasonableness of the ordinance as applied to his property. Once again, we hold that a property owner has no vested interest in the highest and best use of his land, in the solely monetary sense of that term. Thus, there is no private property which has been "taken" from him. Or, in the words of the Supreme Court of Indiana, which this Court quoted approvingly in the case of *Roark v. City of Caldwell, supra,* 87 Idaho at 564–565, 394 P.2d at 645:

"'. . . In considering this point the distinction must be made between zoning regulations which merely restrict the enjoyment and use of property through a lawful exercise of the police power, and a taking of property for a public use, for which compensation must be paid. In the former instance, where the owner of property is merely restricted in the use and enjoyment of his property, he is not entitled to compensation. . . .

"'However, mere regulation under the police power which can be modified at the discretion of regulating authority is wholly different from the taking or appropriating of private property by the government for a specific public use. The latter can be affected only if compensation is provided. *Pennsylvania Coal Co. v. Mahon* (1922), 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322; . . .'" Quoting *Indiana*

*Toll Road Com'n v. Jankovich,* 244 Ind. 574, 193 N.E.2d 237 (1962).

Drawing a line between regulation by the police power and condemnation by the power of eminent domain has vexed every author who has ever written upon the subject. *See,* Bosselman, The Taking Issue, 1973. We need not resolve the question or adopt any of the varying tests today. Clearly, the present case does not even approach the line where valid regulation would pass over into confiscatory taking.

In *Chevron Oil Co. v. Beaver County,* 22 Utah 2d 143, 449 P.2d 989 (1969), appellant sought to locate a gas station at the intersection of two interstate highways. The property was zoned as grazing land and the zoning authority refused to rezone it because of its policy of confining commercial services to the existing urban center some distance away. The Supreme Court of Utah held:

". . . The plaintiffs, with foresight, purchased all of the land abutting on the ramps with the hopes of converting grazing land worth twenty or thirty dollars per acre into highway service land worth $10,000 per acre. The thing which stands between the plaintiffs and their hoped-for profit and which prompted these lawsuits is the fact that the land is still zoned as a grazing area. . . .

"Whether we agree with the wisdom of the county commissioners or do not agree with it is of no importance. The matter is to be decided by a legislative body (the county commission), and the courts do not ordinarily interfere in such matters. However, should a board enact an ordinance which deprives a person of his property, and where it is clear that the board has acted arbitrarily, capriciously, or in a discriminating manner, the courts will grant redress.

". . . We see nothing arbitrary or discriminatory or confiscatory in the refusal to rezone the plaintiffs' land. Plaintiffs are not deprived of their prop-

erty. They bought grazing land, and they still own grazing land. . . ." *Chevron Oil Co. v. Beaver County,* 449 P.2d at 989–991.

Similarly, in *C. Miller Chevrolet, Inc. v. City of Willoughby Hills,* 38 Ohio St.2d 298, 313 N.E.2d 400 (1974) appellant had an option to purchase an eight-acre tract of land located in a single-family residential zone. As here, appellant proposed to use the property for a new car dealership and sought either a rezoning from residential to commercial or a zoning variance. The evidence in the trial court established

" . . . that the value of the property under the existing zoning (single-family residential) was $2,500 an acre, but if a commercial use were permitted the value would be $50,000 an acre."

In dealing with such testimony, the court ruled that

"Evidence that the removal of a zoning restriction would result in an increase in the value of the affected land is relevant when the validity of a denial of a zoning variance is challenged, but as a general rule such evidence does not, of itself, render the board's denial unreasonable, arbitrary, capricious or unconstitutional. [Citations omitted.] In each case, there must be a balancing of interests between the benefits that would flow to the owner of the property if his proposed use were allowed and the benefits to the public health, safety, welfare and morals that are derived from the existing zoning. [Citation omitted.]

"Since the orderly development of an area is a legitimate goal of zoning regulations, appellant's evidence concerning increased land value must be weighed against the expert evidence introduced by appellee regarding its proposed long-range development for the area in which the subject property is located. . . ."

*C. Miller Chevrolet, Inc. v. City of Willoughby Hills,* 313 N.E.2d at 404.

Despite an admission from a member of the planning firm retained by the city to study the area that commercial use would be appropriate, the court refused to hold the rezoning denial as confiscatory.

Finally, in *Ford Leasing Development Co. v. Board of County Com'rs,* 186 Colo. 418, 528 P.2d 237 (1974), the court had before it an appeal from the denial of a rezone from agricultural district to a planned development. Ford intended to construct a new car dealership surrounded by artfully landscaped townhouses. The court said,

"There are two methods to establish that a zoning ordinance is unconstitutional. First, it may be shown it is not substantially related to the public health, safety, or welfare. [This claim was rejected.]

. . .

"The second method is to show that the zoning ordinance precludes the use of Ford's property for *any* reasonable purpose. [Citing *Euclid* and Colorado cases.] . . . True, whatever use is available is perhaps not the highest and best use. But that has never been the test. [Citation omitted.] We have held that in order to obtain rezoning to permit a use which the applicant seeks, he must prove that it is not possible to use and develop the property for *any* other use enumerated in the existing zoning." 528 P.2d at 241. (Emphasis added.)

The court held with some reluctance that Ford had not met its burden of proof on this issue. Uncomfortable with this conclusion, however, the court went on to say that

" . . . just because the land is unsuited for agricultural use does not mean the applicants can skip other intermediate zones up to planned development— the most advantageous for its purpose. Ford presented no evidence that there were no reasonable uses in approximately 8 intervening zones. Such proof is of crucial importance as a prerequisite that property is unconstitutionally confiscated. [Citations omitted.] Without it, Ford failed to meet its high burden of proof." *Ibid.*

Thus, the mere fact that Ford might have proved that the land was not usable as zoned would not have sufficed. It would also have had to prove that it was unusable for any of the less restrictive uses in the

intermediate zoning categories as well before the denial of the rezone would have violated its constitutional rights.

## IV.

To summarize our conclusions: we hold that Blaine County's zoning ordinance was adopted "in accordance with a comprehensive plan"; that the ordinance is reasonable both on its face and as applied to appellant's property despite that fact that it deprives appellant of what is monetarily the highest and best use of his land; and that such a deprivation, absent more, does not amount to a taking of appellant's private property in any constitutionally objectionable sense.

The judgment is affirmed and costs to respondents.

McFADDEN, C. J., and DONALDSON, J., concur.

SHEPARD, Justice, specially concurring.

I concur in the result obtained by the majority opinion and also concur with much that is stated therein. I deem it necessary, however, to state certain caveats.

I disagree that the result here is or should be in any way influenced by the length of time that the appellant has owned the property. First, I see no point in penalizing a person seeking to make a business investment as contrasted with a landowner of 10, 20, 30 or 40 years who seeks to take economic advantage of an increase in value of his land. Secondly, in today's commercial world artfully drawn real estate transactions blur the difference and make impossible of administration any distinction regarding land ownership.

I am also concerned with the limits, if any, which do or should circumscribe the authority of local zoning to restrict development of a person's real property because of aesthetic considerations or purposes such as "maintaining the rural character of the county and the Wood River Valley." The majority tells us that the county contains the world famous ski resort of Sun Valley and that the ordinance seeks to preserve the quality of what is perhaps the county's greatest resource. I think judicial notice may be taken of the existence of the resort and its mushrooming growth in the past several years with attendant commercial and high density multi-residential development. I am somewhat at a loss in rationalizing that massive development in terms of maintaining the "open and rural character of the valley." Perhaps if nothing else, it indicates that commercial development does not per se conflict with aesthetic considerations. Aesthetic considerations are highly subjective and dependent largely on the eye of the beholder. What may be aesthetically pleasing as green and verdant fields in the spring, may be highly offensive in the fall if the farming practice of burning those fields is permitted. A commercial structure with a tastefully constructed rustic exterior may remain offensive to the eye of a Sierra Club member but be highly acceptable to a county official or taxpayer who sees a highly desirable addition to the county's tax base. A commercial property need not necessarily be aesthetically offensive albeit it is difficult for anyone except the owner to truly love an automobile junk yard or asphalt plant.

Lastly, I am in agreement with the theory expressed by the majority that the zoning scheme need not contemplate the zoning of each piece of property as compatible with its highest and best use. I would, however, point out that in this case the property constitutes land of 12 acres bounded on one side by a railroad track and on the other by a major arterial highway constituting a substantial traffic hazard. Under the present zone classification the property at most would yield some 12 residential lots, and I find it hard to conceive that there could be a desirability or value except for the most minimum type of residence. From the size and condition of the property, it seems clear that it would support no agricultural usage, not even pasturage. If such be the case, the zoning has in effect barred any utilization whatsoever of the property.

BAKES, Justice, dissenting:

I cannot agree with the majority that the zoning ordinance in this case was adopted pursuant to the statutory requirement that it "be made in accordance with a comprehensive plan." For that reason, I would hold that the zoning ordinance in question was invalid and that the county may not restrict the use of the appellant's land under *that* zoning ordinance. However, because legislation enacted after this suit was initiated (The Local Planning Act of 1975, I.C. §§ 67–6501 *et seq.*) may well have compelled the county to adopt a comprehensive plan which may validate Blaine County's zoning ordinance, I would remand to the district court to determine whether a comprehensive plan has been adopted pursuant to I.C. 67–6510 since this dispute arose and whether a zoning ordinance enacted in accordance with that plan would establish legal grounds for denying the appellant his petition for rezoning.

I

At the time these proceedings were initiated, the zoning authority of the county was governed by I.C. § 50–1203.[1] This section provided:

"50–1203. Regulations—Purposes in view.—[Zoning] regulations shall be made in accordance with a comprehensive plan, and shall be designed to lessen congestion in the streets, to safeguard from fire, panic and other damages, to promote public health, safety, morals and the general welfare, to provide adequate light and air, to prevent the overcrowding of land, to avoid undue concentration of population, to facilitate the adequate provision of transportation, water, sewerage, schools, parks and other public requirements. Such regulations shall be made with reasonable consideration, among

other things, as to the character of the district and its peculiar suitability for particular uses, and with a view to conserving the value of buildings and encouraging the most appropriate use of land throughout such city."

This statute clearly requires that zoning regulations be enacted in accordance with a comprehensive plan and that they be designed to further the purposes listed in the statute. The record before this Court does not demonstrate that Blaine County's general zoning ordinance was enacted in accordance with a comprehensive plan or show how it furthers the purposes listed in I.C. § 50–1203. Accordingly, I conclude that the zoning ordinance was invalid.

The majority opinion states, however, that the comprehensive plan required by statute " 'need not have a separate physical existence apart from the zoning ordinances, and it need not be in writing, but its design may be found in the scheme apparent in the zoning regulations themselves.' " *Ante* at 1261. However, even if that were the law, the zoning ordinance before us is not a comprehensive plan and no comprehensive plan is apparent from its zoning scheme. This ordinance merely defines the various zones and puts land into those zones; it gives no indication whether these zoning classifications are intended to be permanent or are designed to gradually expand or contract according to some plan, either in the short term or long term future; whether it is the intent of the zoning body to require the most rapid amortization constitutionally possible of non-conforming uses in certain zones or to routinely grant variances in those zones, *see Gordon Paving Co. v. Blaine County Board of County Commissioners*, 98 Idaho 730, 572 P.2d 164 (1977), and compare majority, concurring and dissenting opinions; *see also Saviers v. Richey*, 96 Idaho 413, 529 P.2d 1285 (1974); whether

---

1. Although I.C. §§ 50–1201 *et seq.* gave zoning authority to cities, not to counties, the counties were given zoning authority by reference to I.C. §§ 50–401 *et seq.*, the predecessor sections to I.C. §§ 50–1201 *et seq.*, by I.C. § 31–3801. This Court has considered the codification of the city zoning ordinances in I.C. §§ 50–1201 *et seq.* to also define the county zoning authority,

*Citizens for Better Government v. County of Valley*, 95 Idaho 320, 508 P.2d 550 (1973). All of these statutes defining cities' and counties' zoning authority before 1975 were repealed in 1975 I.S.L., ch. 188. That same session law enacted the Local Planning Act of 1975, I.C. §§ 67–6501 *et seq.*, which has defined local governments' zoning authority since that time.

it is the intent of the zoning authority to encourage commercial or residential development in certain areas in one zone rather than others in the same zone in order to facilitate adequate transportation, water, sewerage, schools, parks and the like, even though several areas may be zoned for eventual residential or commercial development, *see Golden v. Planning Board of Town of Ramapo,* 30 N.Y.2d 359, 334 N.Y. S.2d 138, 285 N.E.2d 291 (1972); or whether it is the intent of the plan to attempt to control the rate of further development, *Golden v. Planning Board of Town of Ramapo, supra;* nor does it give any other guidance to property owners or potential property owners wanting to make either short range or long range plans for the use of property in a given zone. This zoning ordinance is merely a statement of the present zoning map, but I believe an ordinance must contain a statement of future land use goals in order to qualify as a plan. *See Baker v. City of Milwaukie,* 271 Or. 500, 533 P.2d 772 (1975). Also, see the description of the zoning ordinance and comprehensive plan found in the case of *Construction Industry Association of Sonoma County v. City of Petaluma,* 522 F.2d 897 (9th Cir. 1975), *cert. denied* 424 U.S. 934, 96 S.Ct. 1148, 47 L.Ed.2d 342 (1976), for an example of an ordinance and plan which set forth a specific set of goals of the kind I believe are required by I.C. § 50–1203. For a clearer

understanding of what the legislature had in mind in requiring a comprehensive plan, see the *Local Planning Act of 1975,* I.C. § 67–6508–10.

To say that the bare bones statement in Blaine County's zoning ordinance of what uses are presently permitted in each zone constitutes a comprehensive plan is to reduce the statutory planning requirement to a nullity. I emphatically reject the majority's position that a comprehensive plan may be found in this zoning ordinance itself; indeed, the majority has tacitly conceded this because nowhere in its opinion has it described the planning goals apparent in the zoning regulation itself.

I concede that the majority has found several decisions which have construed similar zoning statutes not to require that zoning be done in accordance with a separately stated comprehensive plan. However, simply because those courts have read the comprehensive plan requirement out of their zoning statutes, that does not mean that we should also reject the clear mandate of the legislature, which has been made even more clear by the enactment of the Local Planning Act of 1975, I.C. §§ 67–6501 *et seq.,* especially §§ 67–6508, –10. The record shows that the zoning ordinance in question was not enacted in accordance with a comprehensive plan,[2] and therefore the zoning ordinance is invalid.

2. In addition to the zoning ordinance in question, which defines the zones by the uses to be allowed in each zone and which places land in one zone or another, the record also contains a document entitled, "Blaine County Planning and Zoning Objectives, February 1971." Among the objectives set forth are the following:

"*AGRICULTURAL–RECREATIONAL ZONES:*
*Purpose:*
1. To protect and preserve prime agricultural and recreational lands from random and haphazard development.
2. To restrict development of lands of 25% slope or greater due to problems of access, erosion, etc.

"*LOW DENSITY RESIDENTIAL ZONES:*
*Purpose:*
1. To delineate those areas suitable for residential development due to access, soil char-

acteristics, slope and drainage, orientation and other geographic features.
2. To promote low density development outside existing urban areas so as to maintain the open and rural character of the County and Wood River Valley.
3. To prevent pollution of water tables, streams, rivers and lakes in areas not serviced by public water and sewer facilities.
4. To establish use definitions and dimensional standards to insure the safety and value of individual and adjoining properties.
"*COMMERCIAL AND INDUSTRIAL DEVELOPMENT ZONES:*
*Purpose:*
1. To establish land use zones restricting commercial and industrial development to areas which are geographically suitable and compatible with adjacent land uses.
2. To promote the concentration of C–1 development to areas in and adjacent to existing urban areas.

## II

Next, I think some general comments on Part II of the majority opinion are in order. If, as the majority states in Part I, the zoning ordinance is valid as being in accordance with a comprehensive plan, its analysis concerning the evidence introduced about the highest and best use for Dawson's land, non-conforming commercial uses in the zone predating enactment of the ordinance, the price Dawson paid for the land and whether Dawson had knowledge of the zoning ordinance at the time it acquired the land, and other evidence concerning the peculiar characteristics of this property is unnecessary to establish the reasonableness of the zoning ordinance. That is because the reasonableness of an overall zoning scheme is not to be judged on its application to a particular piece of property in isolation from the overall zoning scheme; instead, reasonableness of the particular zoning scheme is to be judged on whether it serves the purposes set forth by I.C. § 50–1203. If the overall scheme is reasonable, then the owners of property must inevitably accept the zoning commission's exercise of its discretion placing the property in one zoning category or the other. For the majority to pursue its lengthy analysis concerning this individual piece of property is to encourage litigants to think this Court will continue to act as a super zoning board as it did by spot-zoning the property involved in *Cole-Collister Fire Protection Dist. v. City of Boise*, 93 Idaho 558, 468 P.2d 290 (1970). The jurisprudence of this state is poorly served by keeping that expectation alive.

I also take exception to the standard of administrative review articulated by the majority, *ante* at 1263. The majority states that the burden of proving invalidity of an ordinance rests upon the party attacking the ordinance and that, "the burden is all the heavier when . . . the validity

of the ordinance in question has been upheld by three strata of local government appeals as well as by the affirmance of the district court. *Cooper v. Board of Ada County Commissioners*, 96 Idaho 656, 534 P.2d 1096 (1975)." I emphatically disagree with this standard of administrative review. First, *Cooper* says no such thing with respect to increasing the burden of proof on the party attacking the ordinance whenever local governments have upheld the ordinance. Secondly, to say that because the strata of local government which has itself promulgated the ordinance later upholds the ordinance is indicative of the validity of the ordinance is to create what I think to be a wholly unwarranted rule of administrative law which, if followed in other areas, could have far reaching effects in review of administrative decisions. This Court should hardly be surprised that the strata of local government which promulgate and administer the ordinance should decline to rezone a parcel contrary to the ordinance, and should attach no significance to that fact when assigning burdens of persuasion. I daresay this Court would not conclude that a litigant attacking the validity of regulations promulgated by the Department of Employment or the State Tax Commission would face an additional burden of proof simply because the Department of Employment or State Tax Commission upheld its own regulation, *see Ware v. Idaho State Tax Commission*, 98 Idaho 477, 567 P.2d 423 (1977), so I can see no reason why a contrary rule should be invoked for the review of an administrative zoning decision.

## III

Finally, although I dissent from the opinion of the majority, it cannot be said on this record that Dawson is entitled to the relief it seeks. The Local Planning Act of 1975,

3. To establish a rural center zone allowing for a variety of farm-oriented, 'cross-road' type commercial services in suitable outlying rural areas.

4. To establish recreational service areas to be zoned agricultural, allowing for a variety of conditional uses as relate to the specific recreational activity." Ex. 4.

These goals give no indication how the zoning board intends to zone land in the future; where, when or if it will allow more development, whether the board intends to restrict land use because of existing or anticipated difficulties in providing government services, or the like. Thus, this statement of zoning objectives is certainly not a comprehensive pla⌐

I.C. §§ 67–6501 *et seq.*, has been enacted since this litigation began. That act requires local units of government engaged in zoning to develop comprehensive plans for zoning. I.C. §§ 67–6508–10. If a comprehensive plan has been developed under that act and if this zoning ordinance, or later zoning ordinances, put Dawson's property in a non-commercial zone in conformity with that plan, then Dawson's application for a change in zoning would be controlled by that ordinance, even if the board improperly denied his petition when it was initially before it. Accordingly, even though I have concluded that the ordinance in question is invalid, I would remand to the district court for further findings upon the present zoning ordinance and the present comprehensive plan, if any, to determine whether the present zoning ordinances are in conformity with a comprehensive plan as required by § 67–6510, and whether commercial development on Dawson's property is precluded by any such ordinance and plan.