633 P.2d 576

**STATE of Idaho, on the relation of R. Keith Roark, Prosecuting Attorney of Blaine County, Idaho, Plaintiff-Appellant,**

v.

**CITY OF HAILEY, Idaho, a municipal corporation, Emory Dietrich, Hailey City Mayor; Lyle Breneman, Bill House, David Ivie, Verbon, Murphree, Hailey City Councilmen; and Constance Ellway, Hailey City Clerk, Defendants-Respondents.**

No. 13451.

Supreme Court of Idaho.

Aug. 28, 1981.

R. Keith Roark, Prosecuting Atty. for Blaine County, Hailey, for plaintiff-appellant.

Stephen W. Boller, Hailey, for defendants-respondents.

BAKES, Chief Justice.

Blaine County prosecutor R. Keith Roark commenced this *quo warranto* action on behalf of the state against the City of Hailey. Roark alleged that the city council had enacted an annexation ordinance in violation of Idaho's Open Meetings Act and Local Planning Act. Roark now appeals from an adverse decision of the district court.

Jess Groves, general partner of Wood River Associates, desired to develop a tract of land outside the city limits of Hailey in Blaine County. In spring of 1978, Groves sought and obtained from the Hailey city council tentative approval of a plat depicting the proposed development.

In the fall of 1978, Grove requested annexation of the 184-acre tract, then zoned residential by the county. Groves also asked that 12 acres of the property be given a business zoning classification. At its regular meeting of November 13, 1978, the city council referred the request for annexation to the Hailey Planning & Zoning Commission for a public hearing.

The annexation proposal was the subject of public hearings held by the planning and zoning commission on September 5, 1978, and October 3, 1978. At a public hearing held December 5, 1978, the commission unanimously adopted and submitted to the city council a recommendation for annexation of the entire tract to be zoned limited residential.

On January 4 and 11, 1979, the council held special public hearings on the annexation proposal. At the January 11 meeting, the council voted to annex the proposed subdivision, but decided to withhold the decree of annexation until certain conditions were fulfilled.

After the January 11 meeting, a series of four meetings were held. The subject of each session was the annexation proposal.

Each meeting was attended by Hailey Mayor Dietrich, at least two of the four members of the city council, and Mr. Groves. No public notice was given for any of the meetings. No one was excluded from the meetings. No minutes were taken.

The last of these meetings was conducted on March 21, 1979. The final meeting was attended by all four council members, the mayor, the city clerk, Groves, and one of his associates. The meeting was accessible to anyone who wished to attend. Groves presented a rough draft of an "agreement" concerning the conditions of annexation. This memorandum of agreement provided that approximately twelve acres of the development would be zoned as business property. At the close of the meeting, the mayor asked each councilman to express his opinion of the proposals set forth in the memorandum. Two were opposed to the memorandum and two favored it. The mayor voiced his approval.

Thereafter, the mayor instructed the city attorney to prepare a formal ordinance of annexation and a draft of an annexation contract between the developer and the city. The documents were discussed by the mayor and the council at the regular council meeting held in early April, 1979.

The agreement and annexation ordinance were discussed again at a special public meeting held on April 16, 1979, at which time the proposed ordinance was given its first reading. It was given its second reading at a special meeting held April 30, 1979, and its third and final reading at the council's regular meeting of May 7, 1979. The ordinance was passed by the council and mayor at the May 7 meeting. The council members voted according to their preferences expressed at the "non-public" March 21 session, with the mayor breaking the 2–2 tie. The annexation ordinance zoned approximately twelve acres as business property.

The prosecuting attorney then commenced this action by filing an "Information *in quo warranto*" pursuant to I.C. § 6–602.[1]

The first question presented is whether the annexation ordinance was rendered invalid because of violations of the Idaho Open Meetings Act, I.C. §§ 67–2340 *et seq.* The act defines a meeting as "the convening of a governing body of a public agency to make a decision or to deliberate toward a decision on any matter." I.C. § 67–2341(5). The act further provides that all such meetings must "be open to the public and all persons shall be permitted to attend any meeting except as otherwise provided by this act." I.C. § 67–2342(1). The act further requires that meetings be preceded by public notice, I.C. § 67–2343, and that written minutes be taken, I.C. § 67–2344.

The court below held that the four "work sessions" were conducted without notice and minutes and were therefore meetings held in violation of the act. We will assume, without deciding, that the trial court's assessment of the four sessions was correct. Our inquiry, then, must focus on the question of remedy.

The only statute dealing with the consequences of a violation of the act is I.C. § 67–2347, which reads as follows: "VIOLATIONS.—Any action taken at any meeting which fails to comply with the provisions of [this act] shall be null and void." The statute invalidates only *actions* taken at a meeting which does not conform to the requirements of the act.

This is not a case where a public body arrived at a secret, binding decision in closed session, later reemerging to public view to enter a ceremonial, *pro forma* final decision. To the contrary, the district court found as a matter of fact that none of the council members, even those opposed to the proposal, considered themselves bound by

---

1. The prosecuting attorney also filed a declaratory judgment action on behalf of Blaine County. By order of the district court, the two actions were consolidated for trial. At the beginning of the trial, however, the district judge announced that, for reasons not disclosed in the record, he would entertain the *quo warranto* action only. Neither party objected to the form of the action or the nature of the proceedings below or on appeal, and hence we need not confront those questions.

the opinions expressed at the March 21st meeting. There was no evidence of sham or deception on the part of any council member. The annexation ordinance was passed only after discussion at three public hearings conducted by the planning and zoning commission and five public hearings conducted by the city council. The trial court further found that citizens had ample opportunity to and did express their views at such meetings, and that these views were given earnest consideration by the council. Finally, the trial court found that nothing in the council's deliberations were withheld or kept secret from the public by the council or anyone else. The above findings, not contested on appeal, amply support the trial court's conclusion that the deliberations conducted at the four work sessions, as well as the opinions expressed at the March 21st session, were merely preliminary to final action.

■ Other state courts have similarly applied their open meeting or sunshine laws. *See Pokorny v. City of Schuyler*, 202 Neb. 334, 275 N.W.2d 281 (1979) (action authorized at open meetings of city council not invalidated by virtue of defects in prior meetings and closed negotiation session); *Judge v. Pocius*, 28 Pa.Cmwlth. 139, 367 A.2d 788 (1977) (school board action upheld even though each board director had stated his opinion on the matter at prior unofficial work session); *Commissioners Court of Hays County v. District Judge*, 506 S.W.2d 630 (Tex.Civ.App.1974, writ ref'd n. r. e.) (final action at open meeting not tainted by prior non-conforming "workshop" session in which no conclusive action was taken). Consequently, we hold, as did the court below, that where deliberations are con-

ducted at a meeting violative of the Open Meetings Act but no firm and final decision is rendered upon the questions then discussed, the impropriety of that meeting will not taint final actions subsequently taken upon questions conscientiously considered at subsequent meetings which do comply with the provisions of the act.

The relator Roark next contends that the annexation ordinance violates the city's comprehensive plan and Idaho's Local Planning Act of 1975, I.C. §§ 67–6501 *et seq.* The relator's primary contention is that the creation of a twelve-acre business zone in the annexed parcel violates certain comprehensive plan provisions regarding commercial zoning. Alternatively, the relator argues that the plan is too vague to be enforced. The district court upheld the council's classification of twelve acres as a business zone.

■■ I.C. § 67–6511 requires that zoning ordinances be in accordance with a comprehensive plan. Hailey's comprehensive plan, although general, is much more detailed and comprehensive than the "plan" upheld in *Dawson Enterprises, Inc. v. Blaine*, 98 Idaho 506, 567 P.2d 1257 (1977).[2] The Hailey comprehensive plan touches upon commercial development in several respects. The plan states that one of the goals of zoning is "to keep the commercial zone as the center or core of the community." The plan also provides that "[i]t is essential for the down town area to be attractive so as to stimulate business and maintain the business core within the city center." Nowhere in the plan are the terms "downtown", "city center" or "business core" defined.[3] At trial, several maps were

---

2. *Dawson* upheld existing zoning as a comprehensive plan, even though the plan was not embodied as such in any formal document, and even though former I.C. § 50–1203 (repealed 1975 Idaho Sess. Laws, ch. 188, § 1, p. 516) required that all zoning "regulations shall be made in accordance with a comprehensive plan . . . ."

3. The mere fact that these terms are undefined does not render the plan too vague or indefinite to be enforced. To the contrary, block-by-block definition of the downtown core may rob the plan of its flexibility. It is clear that the

above terms are subject to varying constructions, thus accommodating physical expansion at the downtown business sector. Nonetheless, the admittedly general language of the plan does serve to curb the exercise of discretion on the part of the zoning authority. For example, creation of a business sector on the north end of Northridge would clearly conflict with the plan. However, given the proximity of the newly-created business zone to existing commercial zoning, we cannot say the spirit or letter of the plan was violated.

introduced which showed the existing zoning in the city of Hailey. There are several isolated areas of business zoning within the city limits, but the greatest concentration (excluding the airport) is clustered on a state highway which runs through the city as Main Street. The twelve acres in question are adjacent to the same state highway, right across the highway from an area zoned commercial by the county, and approximately one quarter mile away from the main sector of business zoning within Hailey city limits. Hence, there is substantial competent evidence to support the trial court's holding that the annexation ordinance which established the twelve-acre business zone is not incompatible or in conflict with the Hailey comprehensive plan.

Finally, the relator contends that the city council failed to amend the plan concurrently or immediately after passage of the annexation ordinance as required by I.C. § 67–6525. However, that requirement must necessarily be premised on the assumption that the annexation ordinance would require amendment of the comprehensive plan. Having affirmed the trial court's finding that the annexation ordinance does not conflict with the Hailey plan, there is no reason to require the council to amend the plan.

Accordingly, the judgment of the district court is affirmed. Costs to respondents. No attorney fees awarded.

McFADDEN, DONALDSON and SHEPARD, JJ., concur.

BISTLINE, Justice, dissenting.

I.

This case presents this Court with its first opportunity to construe Idaho's Open Meetings Act (Sunshine Law), I.C. § 67–2340 *et seq.* Unfortunately the Court seizes the opportunity not to further the purposes of the Act, but to render it practically meaningless.

The Sunshine Law was passed in response to a perceived public need for access to the decision-making process of state and local governmental authorities in Idaho. Prior to passage of the Sunshine Law, local authorities could conduct legislative deliberations in private and announce their decisions publicly—a situation fraught with the potential for abuse. The solution was to provide citizen access *to the deliberative processes.*

"The way to keep the government from submitting to special-interest pressures is to apply a different kind of pressure, the pressure of citizen involvement. An informed, vigilant, involved citizenry can provide an effective counterforce to special interests. *To do so it must have access to public officials and a knowledge of the process by which policy is made.*" L. Gilson, Money and Secrecy 4 (1972) (emphasis added).

I.C. § 67–2340 provides:

"The people of the state of Idaho in creating the instruments of government that serve them, do not yield their sovereignty to the agencies so created. Therefore, the legislature finds and declares that it is the policy of this state that the *formation* of public policy is public business and shall not be conducted in secret." (Emphasis added.)

These are the purposes of the Sunshine Law. No one argues that the purpose of the Act is to provide citizen access only to meetings at which decisions are announced, or even to provide citizen access to some, but not all, of the meetings at which matters which come within the purview of the Act are considered. The purpose is, of course, to provide access to *all* meetings within the purview of the Act.

In light of these clear purposes, many may be troubled greatly with the Court's pronouncement that "where deliberations are conducted at a meeting violative of the Open Meetings Act but no *firm and final decision* is rendered upon the questions then discussed, the impropriety of that meeting will not taint final actions subsequently taken . . . at subsequent meetings which do

comply with the provisions of the act." (Emphasis added.) The Court apparently feels that expediency compels the adoption of this rule even though it is *directly* contrary to the purposes of the Act because of the Court's awareness that I.C. § 67–2347 (the remedies section of the Act) provides that "Any action taken at any meeting which fails to comply with the provisions of [this Act] shall be null and void." The Court chooses to read "action" as referring only to a final decision. Such a reading is of doubtful validity.

I.C. § 67–2341 defines "decision" as "any determination, action, vote *or* final disposition . . . ." (Emphasis added.) Obviously, "action" as defined by the Act is something other than a "determination . . . vote or final disposition," otherwise the inclusion of that word in the above quoted definition is redundant. "Action" in I.C. § 67–2347 refers to *any* acts taken by the public body, including deliberative acts. The proper reading of the statute is that deliberative actions taken in violation of the Act must be declared void. It then follows that, if the Act is to have any effect at all, the end product of those deliberative actions, even though occurring at another meeting, must also be declared null and void. The Act requires that all decisions, from inception to culmination, be considered and made in public meetings. This decision was not so made. The board, if it wishes to try again, may do so, but at public meetings where the public can be heard from the outset which is assuredly the result the legislature was attempting to achieve when it passed the Act.

The Act defines "meeting" as "the convening of a governing body of a public agency to make a decision *or to deliberate toward a decision* on any matter." I.C. § 67–2341(5) (emphasis added). It ought not be presumed that the legislature would define "meeting" to include deliberative sessions *but then limit the Act's remedy* to meetings at which decisions are actually

"made" or, of even less moment, announced.[1] As this Court stated in *Magnuson v. Idaho State Tax Commission*, 97 Idaho 917, 920, 556 P.2d 1197, 1200 (1976), "all sections of the applicable statutes should be considered and construed together to determine the intent of the legislature . . . it is incumbent upon a court to give the statute an interpretation that will not in effect nullify it." The Court today may be ignoring this primary rule of statutory construction in favor of a hypertechnical reading of an isolated word in the remedies section of the statute which defeats the purpose of the Act.

In a case very similar to this one, *Polillo v. Deane*, 74 N.J. 562, 379 A.2d 211 (1977), the New Jersey court has refused to destroy the efficacy of its Sunshine Law. There a committee had developed a set of recommendations after a series of public meetings. While the violations of the applicable open meetings act which occurred at these meetings were strictly technical, the court nevertheless struck down the final product, stating:

"Acceptance of defendants' final contention that we need look only at the notice given before the last two meetings—when the Commission took formal action—would undermine the entire purpose of the Act. This would allow an agency to close its doors when conducting negotiations or hammering out policies, and then to put on an appearance of open government by allowing the public to witness the proceedings at which its action is formally adopted." *Id.* at 219.

"Many attempts have been made to legislate a middle ground by defining public access in terms of final actions or votes, but this approach makes it much too easy to conduct mere 're-run' votes after all the vital issues have been resolved in private sessions." Wickham, Let the Sun Shine In! Open-Meeting Legislation Can Be Our Key to Closed Doors in State and Local Government, 68 Northwestern U.L.Rev. 480, 492

---

1. I have a great deal of trouble with the foundational premise of the Court's opinion—that decisions are "made" at a particular point in time, as opposed to being formulated over a period of time. It is unfortunate that this premise is not further pursued or explained.

(1973).[2] Under the Court's rationale, members of the Board need only state that they remained open minded regardless of voting commitments reached at private meetings, and such will validate their later actions honoring those commitments. While I do not suggest that most public officials would necessarily act to undermine the law, I believe the better judicial policy is in enforcing the law as enacted by the legislature. Idaho has provided a specific sanction for violations of its Open Meetings Act; that sanction is that actions arising out of violations be declared null and void. No reason, other than mere expediency, appears for not here applying that sanction.

Since the majority, however, feels otherwise, I would emphasize that the opinion is limited to circumstances where (1) no final action is taken at the tainted meeting, (2) subsequent, complying meetings are held at which actual deliberation and open-minded consideration of the issue in question occurs, and (3) affirmative evidence is introduced by the public body demonstrating clearly that its members remained open

minded and uncommitted following the tainted meeting.[3] It would appear, however, that given today's opinion, legislative action is necessary if the state's Open Meetings Act is to have any continuing vitality.[4]

### II.

As to upholding the zoning ordinance, I cannot comprehend how that ordinance can be viewed as complying with the Hailey comprehensive plan. As the majority notes, two provisions in the Hailey plan require that business zones be adopted to promote clustering in the city center—an admirable goal. Specifically, goal (d) of the plan states: "Maintain zoning to keep the commercial zone as the center or core of the community." Under the section entitled Community Design, the plan states: "It is essential for the down town area to be attractive so as to stimulate business and maintain the business core within the city center." The district judge found that the above quoted sections of the comprehensive plan were "too vague to support a finding or conclusion that Ordinance # 395 is nec-

2. In this regard, I note that none of the remedies provisions in the statutes at issue in the three cases cited by the majority is similar to Idaho's. The statutes in *Pokorny v. City of Schuyler*, 202 Neb. 334, 275 N.W.2d 281 (1979) (Neb.Rev.Stat. § 84–1414(1)) and *Judge v. Pocius*, 28 Pa.Cmwlth. 139, 367 A.2d 788 (1977) (65 Pa.Cons.Stat. § 262), both specifically provided for voiding only "formal action." *Commissioners' Court v. District Judge*, 506 S.W.2d 630 (Tex.Civ.App.1974) (Tex.Rev.Civ.Stat.Ann. art. 6252–17(4)) does not even *authorize* courts to nullify actions, it merely provides for sanctions against officials who violate the act. In considering the remedy which Idaho's legislature provided in our Sunshine Law, I can find no guidance in these cases.

3. In this regard, I note that the act imposes no scienter requirements as a prerequisite to applying the remedies section. However, the majority has seized upon the showing of "good faith" by the city council, and, given the majority's disposition, this limiting requirement is infinitely preferable to the alternative of no such requirement.

4. The remedies provision of Oregon's Public Meetings Act offers at least a partial solution to the problems created by today's decision. ORS 192.680 provides:

"Enforcement of ORS 192.610 to 192.690; effect of violation on validity of decision of governing body; liability of members. (1) Any person affected by a decision of a governing body of a public body may commence a suit in the circuit court for the county in which the governing body ordinarily meets, for the purpose of requiring compliance with, or the prevention of violations of ORS 192.-610 to 192.690, by members of the governing body, or to determine the applicability of ORS 192.610 to 192.690 to matters or decisions of the governing body. The court may order such equitable relief as it deems appropriate in the circumstances. A decision shall not be voided if other equitable relief is available. The court may order payment to a successful plaintiff in a suit brought under this section of reasonable attorney fees, by the governing body, or public body of which it is a part or to which it reports.

"(2) If the court makes a finding that a violation of ORS 192.610 to 192.690 has occurred under subsection (1) of this section and that the violation is the result of wilful misconduct by any member or members of the governing body, that member or members shall be jointly and severally liable to the governing body or the public body of which it is a party for the amount paid by the body under subsection (1) of this section."

essarily incompatible or in conflict with the Comprehensive Plan to the extent that Ordinance # 395 can be found null and void because of the Comprehensive Plan." I agree that the comprehensive plan for the city of Hailey is vague. That, however, does not preclude the inescapable conclusion that this annexation and zoning ordinance are in conflict with the plan or, more accurately, are not "in accordance with the adopted plan." I.C. § 67–6511(b) & (c). The reason for this conclusion is, to my mind, extraordinarily simple. *The subject area was not even within city limits at the time that the comprehensive plan was adopted.* Regardless of what the planners had in mind as being the "city center" when they promulgated the standards set forth above, it *could not* have included the subject area.

It may be argued in response to this point that cities must grow, and to bind Hailey to the geographical-jurisdictional boundaries which existed at the time the plan was adopted is unrealistic and would work a hardship upon municipal governments. I would agree. So would the legislature. That is undoubtedly why it included I.C. § 67–6525 in the Local Planning Act of 1975. I.C. § 67–6525 provides:

"Plan and zoning ordinance changes upon annexation of unincorporated area. —Prior to annexation of an unincorporated area, a city council shall request and receive a recommendation from the planning and zoning commission, or the planning commission and the zoning commission, on the proposed plan and zoning ordinance changes for the unincorporated area. Each commission and the city council shall follow the notice and hearing procedures provided in section 67–6509, Idaho Code. *Concurrently or immediately following the adoption of an ordinance of annexation,* the city council shall amend the plan and zoning ordinance." (Emphasis added.)

Clearly, this section was intended to provide for expansion of comprehensive plans to absorb annexations. Concurrent plan amendment insures that annexed property will be assimilated into the overall planning scheme rather than simply tacked onto existing (presumably planned) zoning. Thus no city, including Hailey, is precluded from proper annexation of adjacent property by the mere fact that a comprehensive plan developed at a particular point in time governs zoning within a city's boundaries as they existed at the time the plan was adopted. Even annexations which would appear to be in conflict with the comprehensive plan may be adopted when the plan is amended—presumably the plan will be revised more extensively when such is the case.

It must be noted that the commercial rezoning at issue here is in *actual* conflict with the comprehensive plan, as well as being outside the geographical boundaries of the city. The wording of the plan, *i. e.,* "city center," "center or core of the community" may be subject to interpretation as to just where within the city boundaries the "center" is located—for example, one of the existing business sections, apparently in what is considered "downtown" Hailey, is on the western boundary of the town. However, as the majority opinion notes, the rezoned property at issue here is approximately one quarter of a mile away from the nearest Hailey commercial district on the western edge of the town. While a portion of the intervening (county) property is zoned "commercial" by the county, the record does not indicate whether this property has yet been commercially *developed.*[5] The property rezoned commercial by the city may technically be "right across the highway" from this county property, but to be accurate I would add that only the *eastern tip* of the rezoned property is "across the street" from the county (zoned commercial) property, and the bulk of the city rezoned property is further west than both the county and city commercial property. In

---

**5.** Part of the property which intervenes between the city and the commercially rezoned area is city property zoned residential.

short, the city has established an outpost of commercial property which may now be pointed to to justify filling in the intervening (city) property with commercial development. To my mind, this is in direct conflict with the commercial clustering goals of the Hailey comprehensive plan. *At a minimum*, it is not "in accordance" with that plan. Absent an amendment to the plan, then, this annexation is clearly both in direct conflict with and "not in accordance with" the existing plan, which is the applicable plan in this case, and which was *not* amended to include this property. I would hold as a matter of law that the annexation and subsequent zoning are in conflict with the comprehensive plan, and should be struck down.[6]

Finally, the Court cites *Dawson Enterprises, Inc. v. Blaine County*, 98 Idaho 506, 567 P.2d 1257 (1977), for the proposition that Hailey's plan, "although general, is much more detailed and comprehensive than the 'plan' upheld in *Dawson* ...." I assume that this is a response to relator's argument that the plan is too vague to be enforced. We specifically noted in *Dawson*, however, that "The opposite result would be compelled in the presence of an enabling statute which expressly makes the adoption of a comprehensive plan a condition precedent to the validity of a zoning ordinance. Such a procedure is mandated by the 1975 Local Planning Act ...." 98 Idaho at 511, 567 P.2d at 1262. In fact that Act, which was not applicable in *Dawson* but is applicable here, provides in regard to the comprehensive plan that:

"It shall be the duty of the planning or planning and zoning commission to conduct a comprehensive planning process designed to prepare, implement, and review and update a comprehensive plan, hereafter referred to as the plan. *The plan shall include all land within the jurisdiction of the governing board.* The plan shall consider previous and existing conditions, trends, desirable goals and objectives, or desirable future situations for each planning component. The plan with maps, charts, and reports shall be based on the following components unless the plan specifies reasons why a particular component is unneeded.

"(a) Population—A population analysis of past, present, and future trends in population including such characteristics as total population, age, sex, and income.

---

**6.** It is no answer to say that the city council went through the *procedures* required for a plan amendment during its annexation and rezoning process; although the procedures for rezoning and plan amendment are essentially identical—*see* I.C. §§ 67–6509 & 67–6511—the *subject matter* of the two proceedings is radically different. For example, if one is informed by proper notice that a rezoning is to take place, one would certainly be entitled to believe that the rezoning would be governed by the applicable comprehensive plan. Furthermore, comprehensive plans by their very nature require greater detail and more long range planning than zoning ordinances. An amendment to a comprehensive plan is an issue which an entire community would be interested in; a zoning ordinance might attract only the attention of landowners in the immediate vicinity of the parcel to be rezoned. In any event, the procedures followed here simply did not comply with I.C. §§ 67–6509 and 67–6525. None of the notices of annexation mentioned plan amendment. None of the notices of the planning and zoning commission meeting even mention adopting a *zoning* ordinance. Perhaps more importantly, no recommendation on plan amendment was given by the planning and zoning commission to the city council as required by I.C. § 67–6509, and in fact the city council did *not* amend the plan as required by I.C. § 67–6525. *See Hines v. Pinchback-Halloran Volkswagen, Inc.,* 513 S.W.2d 492 (Ky. 1974). The majority dismisses the clear statutory requirement that comprehensive plans be amended whenever an annexation occurs, I.C. § 67–6525, by making the statement that, since (according to the majority) "the annexation ordinance does not conflict with the Hailey plan, there is no reason to require the council to amend the plan." The majority gives no reasoning or legal basis for this statement, which is in direct conflict with the express language of I.C. § 67–6525. Furthermore, regardless of one's position on whether there is a conflict here, I would think that annexing 184 acres to any city, but particularly Hailey, would require an amendment to a comprehensive plan. The area annexed appears to be approximately equal to *one fifth of the city's total former size.* Given the detail required in comprehensive plans—see text, *infra*, and I.C. § 67–6508—including *maps* of the plan area—it guts the 1975 Planning Act for the Court to allow such large annexations to go completely unaddressed in the comprehensive plan.

"(b) Economic Development—An analysis of the economic base of the area including employment, industries, economics, jobs, and income levels.

"(c) Land Use—An analysis of natural land types, existing land covers and uses, and the intrinsic suitability of lands for uses such as agriculture, forestry, mineral exploration and extraction, preservation, recreation, housing, *commerce, industry,* and public facilities. *A map shall be prepared indicating suitable projected land uses for the jurisdiction.*

"(d) Natural Resource—An analysis of the uses of rivers and other waters, forests, range, soils, harbors, fisheries, wildlife, minerals, thermal waters, beaches, watersheds, and shorelines.

"(e) Hazardous Areas—An analysis of known hazards as may result from susceptibility to surface ruptures from faulting, ground shaking, ground failure, landslides or mudslides; avalanche hazards resulting from development in the known or probable path of snowslides and avalanches, and floodplain hazards.

"(f) *Public Services,* Facilities, and Utilities—An analysis showing general plans for sewage, drainage, power plant sites, utility transmission corridors, water supply, fire stations and fire fighting equipment, health and welfare facilities, libraries, solid waste disposal sites, schools, public safety facilities and related services. The plan may also show locations of civic centers and public buildings.

"(g) *Transportation*—An analysis showing the *general locations and widths of a system of major traffic thoroughfares* and other traffic ways, and of streets and the recommended treatment thereof. This component may also make recommendations on building line setbacks, control of access, street naming and numbering, and a proposed system of public or other transit lines and related facilities including rights-of-way, terminals, viaducts and grade separations. The component may also include port, harbor, aviation, and other related transportation facilities.

"(h) Recreation—An analysis showing a system of recreation areas, including parks, parkways, trailways, river bank greenbelts, beaches, playgrounds, and other recreation areas and programs.

"(i) Special Areas or Sites—An analysis of areas, sites, or structures of historical, archeological, architectural, ecological, wildlife, or scenic significance.

"(j) Housing—An analysis of housing conditions and needs; plans for improvement of housing standards; and plans for the provision of safe, sanitary, and adequate housing.

"(k) Community Design—An analysis of needs for governing landscaping, building design, tree planting, signs, and suggested patterns and standards for community design, development, and beautification.

"(*l*) Implementation—An analysis to determine actions, programs, budgets, ordinances, or other methods including scheduling of public expenditures to provide for the timely execution of the various components of the plan.

"Nothing herein shall preclude the consideration of additional planning components or subject matter." I.C. § 67–6508 (emphasis added).

Following today's opinion, and despite the clear statutory language set forth above, annexed areas that are not "in conflict" with existing comprehensive plans will not have to have public services, such as sewage, drainage, transportation and power plant sites, planned for or even addressed by a comprehensive plan. And all of this because the Hailey plan, while vague, is "more detailed and comprehensive" than a plan upheld *prior to the effective date* of the 1975 Local Planning Act. The plan that is before this Court does not even contain two of the statutorily required components —(a) population or (b) implementation. No reasons for their absence are given. While I do not understand relator to be arguing that the plan in its entirety should be struck down because it is vague, I do believe that realtor has a valid point when he argues

that if the plan is too vague to understand in this particular area—zoning of commercial properties—it is too vague to be enforced and therefore, at least in regard to this zoning ordinance, *may not be used as proof* that the requirements of I.C. § 67–6511—that ordinances be "in accordance" with a plan—were met in this instance. The district court itself admitted that "I believe ... the comprehensive plan ... is too vague to support a finding or conclusion that Ordinance # 395 is necessarily ... in conflict with the Comprehensive Plan ...." Given the record before us, I would hold as a matter of law that Hailey must amend its comprehensive plan in accordance with I.C. §§ 67–6508, 67–6509 and 67–6525 before this annexation and rezoning ordinance may be upheld.